May it please the Court, Counsel, my name is Lawrence O'Neill, and I represent the Kirkpatrick in this cause. This is a direct appeal following a bench trial where Dr. Kirkpatrick was found guilty of charges regarding allegations of mistreatment of animals and practicing veterinary medicine without a license. Six issues have been raised in this appeal. In argument one, I ask this Court to reverse Dr. Kirkpatrick's conviction for aggravated and cruel treatment of an animal because the State failed to prove beyond a reasonable doubt that she committed the offenses charged in Amendment Count 1. The charge alleged that she committed the offense and that she intentionally performed a surgical operation upon a dog named Chief in an unsterile manner, thereby committing an act that caused the animal's death. The offense as charged thus requires the State to prove three elements beyond a reasonable doubt. One, that Dr. Kirkpatrick intended to operate on Chief in an unsterile manner. Two, that she intended to kill or seriously injure the animal. And three, that the surgery on Chief in an unsterile manner caused Chief's death. The evidence presented at trial failed to prove all three of these elements beyond a reasonable doubt. Your Honor, counsel, now this, your client was a licensed vet but was not at the time of the charges here. Correct, Your Honor. And so she had to know that it was an unsterile environment. I mean, I've seen the pictures. I respectfully disagree, Your Honor. And the reason she performed the surgery was to save the animal's life and was asked to do so by the owner. She sterilized the raised six-foot island in her kitchen. Sterilized that with bleach and disinfectant. And then sterilized the instruments and the gloves and testified uncontradictively that that surgical area was sterile. And the argument the State would make is that there were on the floor surrounding the raised elevated island in the kitchen was not sterile. However, we should admit, Your Honors, that there was no testimony that a woman had to perform a sterile surgery on a raised island even though the environment is not sterile. So I'm looking at page 8 of the appellate brief. There's three photographs there that show that raised area. And I don't know if there are other pictures, but there are things all over that. There looks like there's an animal in a cage. There's another cage. There's all kinds of things all over that raised area. Not in the surgical area, Your Honor. Then there was no feces. There was no feces in the raised area. So the argument is that she was not charged with sterilized manner. And the uncontradicted testimony was that that area of surgery was sterile. Your Honors, veterinarians perform surgeries in barns all the time. But as long as proper sterilization procedures are followed for the surgery location, the surgery site, then that's a sterile manner, even though perhaps the environment is not sterile. Sterile. Now, in the intent, to your question, Your Honor, that she had to have known this was not sterile, she testified conclusively, uncontradictedly, that it was sterile. And she took all these techniques and procedures, sterilization procedures necessary to make the surgical area sterile. It is a stronger argument, though, that, hey, look, I didn't intend to kill. Well, that's definitely part of the argument, too. But again, all three elements of the charge, the State failed to prove. And one of them is that she Mr. O'Neill, you can answer that in a moment. I just want to ask one question. Did they have an expert, Dr. Alan Hodnap, a five-year veterinarian? And he testified regarding the cause of death. Okay. So when you said it was uncontradicted about the sterile environment, that's what you're referring to? Correct. Okay. All right. Correct. He didn't testify to that. Yeah, that's correct. And that is the third element that the State failed to prove. Well, going back to Justice testified. The State? The expert for the State testified. The cause of death. The cause of death. Correct, Your Honor. Okay. If you win the process of answering that other question about intent to kill, I didn't want to talk you off any further. Well, Your Honors, the intent was to save this dog's life. The owner had taken this dog twice in the two weeks before the surgery to an emergency animal clinic in Missouri with serious condition, symptoms of dehydration, inability to walk, vomiting, very lethargic. And then the second visit to the emergency clinic, the owner was told that the dog had a large sertoli cell tumor in its undescended testicle that needed to be removed. The intent, the owner asked Dr. Kirkpatrick to perform the surgery to save this dog's life, and that's the, that's, I'm contradicted that that's the reason, that's the intent that Dr. Kirkpatrick performed the surgery. There was no evidence or even reasonable suggestion that Dr. Kirkpatrick had the intent to kill this dog. The state, faced with no evidence of the intent to kill or seriously injure this animal, the state, in closing argument, kind of shifted its argument to say, considering the conditions of the house and the unsterile environment, Dr. Kirkpatrick must have known that performing surgery in these conditions would cause, would cause death or serious injury, and the state relies on people versus lead, which is a totally distinguishable case, where this was four horses in an enclosed horse stall that had, were in three feet of hardened ore that caused, caused problems with their legs and that they had to be put down. And here, there was no evidence, so the waste, the animal waste was the direct cause of the horse's death. Here, there was no evidence that the conditions of the house were the result of the dog's death. Both Dr., Dr. Gordon Ryan, who's a state expert, and Stacy Ballard testified that you, that the only way to get for a bacterial peritonitis to occur is if a bacterial carrying substance has direct contact with an open wound. And there was, there was none, that does not, that rules out the environment and any kind of, I don't know, pathogenic particles floating up to cause a bacterial infection in the open wound of the dog during the surgery. But Counselor, didn't your client admit that, look, I wouldn't want one of my animals, you know, operated in this fashion? Under normal circumstances, that would be true, but this was, this was a, this was not, this was the circumstances presented to Dr. Kirkpatrick. That does not mean that he either intended to perform the surgery in a non-sterile manner or intent to kill. And before my time runs out, I'm going back to the third element that the state failed to prove is the cause of the death. And that goes to the state presented an expert, Dr. Hoddeck, who testified that based upon his physical examination and lab work that he did, that the dog had died of bacterial peritonitis secondary to surgery contamination. There were several problems with Dr. Hoddeck's testimony, but most importantly, at the time we have here, is that Dr. Hoddeck did not perform a paracentesis on the dog, which is extracting liquid from the abdomen and then analyzing it with a bacteria. There was no, and the state, the defendant's expert testified that it's, you cannot make an accurate diagnosis. Without performing that test. Correct. And a necrosis, which is an animal autopsy. Thank you, Your Honors. We'll have a few moments after the state. Okay, Ms. Shanahan. Ms. Shanahan, how much time was there between the time of He was breathing on his own about 2.15. She called and spoke to the owner about 2.30. The police were informed basically of the smell. I don't know if you've ever had the privilege of smelling dead flesh rotting, but that was the smell that caused the process server to call the police. That happened about 6.30, I believe. Same day. Pardon me? Same day. Yes. Roughly four hours after the surgery was over. And Chief was discovered very shortly after that. He was alive, but he is described by more than one possibly having seizures. He died the next morning. Counsel, I still think intent is the issue in count one. Pardon? I still think intent is the issue. I think it's the issue of the fact that the defendant was unlicensed and operated in this, you know, arguably unsterile environment. But did she have the intent to actually kill Chief, or was it just gross, reckless, wanton conduct, if I can use those terms? I think that's exactly the issue that was presented to the finder of fact. And finder of fact found that there was a specific intent. Not necessarily to kill, because it doesn't say to kill. It says to suffer death or serious injury. Now, to answer your question more completely by saying what evidence was there of it, let's go back to the very point that you brought out of the conditions of that counter that are in the State's brief. That's the counter. Now, it doesn't matter if you call it a raised elevated island. It's a kitchen counter. It's separate from the others. I have one in my When the police arrived about 645, the defendant was gone. Those pictures were taken in the next couple of hours after that. Certainly nothing changed after 645, let's say that. According to the defendant's timeline, if accepted, she left home about 3. So, I'm sorry, that's not right, 6. She said she left home about 6. So we have her finishing the surgery about 2.30 and leaving home about 6. She said in her interview with the police officer that the stuff on those counters, and she didn't specify which, but she said the stuff on those counters had been sitting there for months. We have a fact finder who listens to someone say, at 2 o'clock, this island in my kitchen was completely sterile. Sterile enough to perform open abdominal surgery. And I think there's a distinction. I want to briefly touch on doing surgery in barns and stuff. The type of surgery that's done in barns is not open abdominal surgery. But this does expose all of the organs in the abdomen to everything. Why do you say it's not abdominal surgery done in barns? Pardon me? Why do you make the statement that there is not abdominal surgery done in barns? My own personal knowledge. Okay. Because, I mean, I could imagine where that could happen under a set of circumstances. I mean, for example, even a C-section could be done in a barn where a horse is having trouble, you know, delivering, right? You wouldn't take the horse. We're getting way outside of the record here. You can't turn a horse on its back and open it up without, I mean, that's why horses die frequently from surgery is as soon as you turn it on its back and open it up, it's very likely to die. You just don't do it in a barn. But the essence of what we're talking about here is the whole issue of when this infection occurred and how it occurred. You know, bacteremia, for example, takes a little while to seed in the blood. Well, when you're dying a specific intent crime, and you're talking about bacteremia, which is what I think everybody's talking about here, is sepsis or bacteria in the blood or whatever causing a whopping infection or death. The state seemed to have been linking that only to this unsterile environment. Is that wrong or right as you read it? Well, the state didn't charge that Chief died of an infection. They charged that she performed surgery in an unsterile environment. Unsterile environment. Unsterile manner. Okay, manner, but the causation doctor talked about the peritonitis. Dr. Rhine pointed out that bacteria is prevalent in feces and all of the crap that was all over this kitchen floor with all these animals running loose. Could I digress slightly to Justice Overstreet's question? Absolutely. I want to go back. You pointed out the very reason I put those pictures in my brief is that in order to accept the defendant's position that when she did this surgery, that counter was sterile. You have to say she completely cleaned it off and made a sterile environment and you have to overlook the fact that there's a ceiling fan hanging right over it with cobwebs hanging from it. And then you have to say from between 2.30 and 6.30, or 6 actually, she took all that stuff that you see in those pictures including, you said you saw a dog, there were two dogs in that crate. The dog, the dogs in the crate, the dog food, the almond milk box, what looks to be like a bloody pizza cutter, but all of the stuff that is on that island where she did that counter, you have to say that she cleaned it all off, did the surgery and then put all that stuff back on it. And I think a fact finder can reject that premise. And I understand your argument and what the fact finder found, but I'm going back to intent. Okay. To kill Chief. Reckless wanton conduct, you know, that's one thing, but intended to kill Chief. And isn't that what the or cause serious harm? Okay, we have a person who's not a vet, but is licensed as a vet, has practiced. She makes so many admissions. You pointed out one of them. I would never have my own dog done in a place like that. I knew this wasn't sterile. She said, yes, she could have just sent Chief to another vet. I want to also point out something. There is the intimation in defendant's argument that this was an emergency, that she had to rush in and save Chief's life. Chief was fine. Chief was playing with his owner's children when the defendant picked him up. Yes, he'd had some health problems and they needed to be corrected. Nobody knows whether it was a serotonin tumor. It may have been. But nonetheless, it was not an emergency situation. She did it because she needed the money. She admitted she did it because she needed the money. She admitted that she was going to charge Mr. Snoddy $800 for doing this. I think her training and knowledge is where you get the specific intent. Maybe if a layman does this, maybe not. But someone with the knowledge of how infections spread so easily, of how feces carry bacteria, and yet you put a dog on a kitchen island and you have in this area a pit bull, cats, a cockatoo, two roosters, a pot-bellied pig, which was loose, a serval cat, a bobcat that was loose in her bedroom right next to this area, a dog named Tom, the two Yorkie mixes that you saw in that crate, two other dogs, a possum, and then Shane, the dog that shoots its own foot off, and Chief. And you put him on your kitchen counter. That person with that training knew that there was a likelihood of contaminating that surgical site. Thank you very much. Mr. O'Neill. Your Honor, I must start with counsel's reference to Dr. Kirkpatrick's statement that she performed the surgery because she needed money. She also said she performed the surgery because the owner asked her to and the dog was going to die without it. But more importantly, her motive to perform the surgery, needing money, is irrelevant to the question of her intent regarding the elements of the offense here. It has nothing to do with all veterinarians assumably get paid. The reason she performed the surgery has no relevance to the intent, which is the issues here. I think we need to look at the cause of death is the state's theory of the case. The state's theory of the case was that the dog died by bacterial peritonitis. Whether there's cobwebs coming from the ceiling, that does not cause bacterial peritonitis. And all the other environmental issues in the room and in the house, that has nothing to do with the dog getting bacterial peritonitis. Again, that only occurs by a bacterial-carrying substance having direct contact with an open wound. The feces on the floor cannot cause bacterial peritonitis. It doesn't ooze up like some kind of an osmosis or something. That's not how it occurs. And we in modern medicine know it. And no expert, no evidence testifies that that's how a dog can get peritonitis. What was the basis for her performing the surgery? The basis? Why did she perform the surgery? Well, she stated that she was this dog's veterinarian since the dog was one year old. And the owner came to her, told her about the results. What was the diagnosis of the dog? That it had a large, tertiary tumor on an undescended testicle that needed to be removed or the dog was going to die. That was why she performed the surgery. I understand. I guess I... What is the... How does that tumor form? Did anyone testify to that? No, but as the veterinarian of the dog for many years, Dr. Kirkpatrick, had told the owner about this condition before, but it wasn't until this dog had these terrible symptoms that required it to go to this emergency clinic in Missouri twice in two weeks leading up to the surgery that the owner actually took action on it to have the mass moved. Yes, yes. So I think basically what the parliament is is kind of an emergency. It needed to be done. It needed to be done quickly, correct? Well, that was definitely one of the reasons the surgery was performed. And again, that goes against any intent to perform the surgery in a necessary manner or any intent to kill or seriously injure the animal. There's no evidence of that. The surgery was to remove a life-threatening, probably cancerous mass on the dog and save its life. Mr. Neal, I'm going to ask you this question. In ordinary murder cases where we charge murder with intent to kill or do great bodily harm, we can look at the circumstances around the intent factor. Yes. In this case, there seems to be a specific intent statute. Do you think we're limited to the intent issue, and we can't look at whether there were feces around and all of the other elements of the case to infer intent to kill? Do you think there's some limitation because of this particular statute? Well, this particular statute, and in the statute that defines intent, it's conscious purpose or objective to accomplish. That's the intent. Conscious purpose, correct. Or objective to accomplish. Which is different than ordinary murder. Correct. Encounter. Right. And the record is just devoid of those. And so the state failed to prove all three elements. The intent to perform surgery in a non-sterile manner. Why would she have that intent? The intent to kill or cause seriously harm. There's no evidence of that. And then the cause of the death. I spoke about that earlier. But the only way you can diagnose bacterial peritonitis can be accurately made is with the paracentesis when the animal is alive and then the necropsy. That's going to reverse the conviction. And the other convictions in the counts two and three. Thank you, Your Honors. Thank you, Mr. Chairman. Thank you, Ms. Jolian. Thank you, Mr. Chairman. Thank you for taking on the advisement. And we will ensure that it works.